IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:06CR415 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| CONRAD JOHANN SANTON, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Conrad Johann Santon (Santon) (Filing No. 30).  Santon is charged in the Superceding Indictment with the possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count I); a criminal forfeiture (Count IV) in violation of 21 U.S.C. § 853 regarding various currency seized from Santon during the period of the charged criminal conduct (Count II); and the use and carrying of a firearm during a drug trafficking offense (Count III) in violation of 18 U.S.C. § 924(c).  **See** Filing No. 20.  Santon seeks to suppress evidence obtained from Santon's person and his vehicle during a detention by the Omaha Police Department (OPD) on November 15, 2006.

An evidentiary hearing was held on Santon's motion on May 10, 2007.  Santon was present with retained counsel James C. Webering.  The United States was represented by Assistant U.S. Attorney Maria R. Moran.  During the hearing, the court heard the testimony of OPD Officers Robert Alexander (Officer Alexander) and Robert Kroeger (Officer Kroeger) and the defendant Santon.  The court also received into evidence a CD recording of an OPD 911 recording (Exhibit 101).  A transcript of the hearing (TR.) was filed on May 17, 2007 (Filing No. 38).

**FINDINGS OF FACT**

At approximately 1:27 a.m. on November 15, 2006, OPD 911 received a call from Kim, an employee at Bucky's gas station at 2510 South 132nd Street, Omaha, Nebraska. Kim told the 911 operator there was a black Intrepid automobile parked at the north end of her building's parking lot and there might be some drug activity going on.  Kim requested

an OPD officer to check it out. Kim told the 911 operator that her truck driver told her there appeared to be some "drug stuff" going on and that there was an individual who was lying down in the vehicle. When asked by the operator if narcotics were observed, Kim said "possibly." **See** 911 recording - Exhibit 101.

Officer Alexander, a veteran of the OPD since 1994, is assigned to the Southwest Precinct as a uniform patrol officer (TR. 4, 22). Officer Alexander was working the A shift which started at midnight, was on patrol alone, was in uniform and was driving a marked cruiser (TR. 5). Officer Alexander received a general call through OPD dispatch that Kim, at Bucky's gas station at 132nd and Arbor, called 911 and reported that a suspicious black Intrepid automobile was parked at the north end of Bucky's parking lot and there was possible drug activity (TR. 6). Officer Alexander drove to Bucky's and observed an unoccupied black Intrepid parked at the north end of the Bucky's parking lot next to the building (TR. 6). Officer Alexander went into Bucky's and talked with Kim, the clerk (TR. 7-8, 32). Officer Alexander had met Kim before when responding to police calls in the past (TR. 32). Kim told Officer Alexander that one of her drivers reported to her that the driver suspected some drug activity was going on in the Intrepid (TR. 8).

Officer Alexander walked out to the parked Intrepid and looked into the Intrepid using his flashlight (TR. 9). Officer Alexander observed the hand grip of a pistol protruding from between the driver's seat and the console (TR. 9). Officer Alexander determined the handgun was in violation of the concealed weapons law as the handgun was not completely visible so that the entire object could be seen (TR. 10). Officer Alexander checked the license plate of the Intrepid and found it was not reported stolen (TR. 12). Given the 911 call, his conversation with Kim about suspicious drug activity, and the handgun in the Intrepid, Officer Alexander was concerned that there was criminal activity ongoing in the area (TR. 10). Officer Alexander drove to nearby businesses to see if there was any suspicious activity afoot (TR. 10-11). Officer Alexander checked a nearby Dave & Busters, a restaurant and entertainment establishment, but it was closed for the evening (TR. 11-12). Also closed were nearby businesses including a Valentino's (an Italian pizzeria) and a tire store (TR. 13-14).

Meanwhile, OPD Officers Kroeger and Comstock arrived at the scene in separate cruisers also in response to the OPD dispatch call (TR. 11-12). After Officer Alexander met with the other officers and informed them of his findings, all the officers decided to wait out of sight behind the tire store and observe the parked Intrepid (TR. 12-13). Approximately twenty to thirty minutes later, the officers observed a Camaro automobile arrive at Bucky's and park next to the Intrepid (TR. 14-16, 60). Once the Camaro arrived, two males got out of the Camaro and went to the trunk of the Intrepid which the males opened (TR. 60). The three OPD officers immediately moved in and parked their cruisers behind the two parked cars to block the cars from moving (TR. 52). The officers got out of their vehicles and instructed the two males to put their hands on one of the OPD cruisers (TR. 16). Both of the males were frisked for officer safety (TR. 16, 18, 63, 65). The officers identified the two males as Santon and Kevin McDonald (TR. 17).

Officer Alexander frisked McDonald, who admitted to be the driver of the Intrepid, and Officer Kroeger frisked Santon, the driver of the Camaro (TR. 17-18, 64). Officer Alexander found nothing of evidentiary value on McDonald and asked McDonald if the officers could search the Intrepid (TR. 18-19). McDonald gave permission for the officers to do so and stated the car was registered to his mother but it was his car (TR. 17-18). The officers found a handgun, an open pocket knife, and a small scale inside the Intrepid (TR. 19-20). McDonald was arrested for carrying a concealed weapon, possession of an unregistered firearm, and possession of drug paraphernalia (TR. 20).

As Officer Kroeger patted down Santon, Officer Kroeger felt a large bulge in Santon's right front pants pocket (TR. 65). When asked what was in his right pants pocket, Santon said money and cigarettes (TR. 65-66). When Officer Kroeger patted down Santon's left side, Officer Kroeger felt what he believed to be a cigarette package (TR. 65-66). Officer Kroeger removed the items from the left pocket and found a cigarette package and money (TR. 65-66). Believing Santon to be lying about what was in his right pants pocket, Officer Kroeger felt the item in the right pants pocket again and, based on his experience, determined the item felt like a plastic baggie containing drugs (TR. 68-69). Officer Kroeger removed the items in the right pants pocket which turned out to be methamphetamine and a cell phone (TR. 65-69). Santon was arrested for driving on a

3

suspended license and possession of a controlled substance (TR. 69-70, 72-73). Santon's Camaro was searched and additional drug paraphernalia was found (TR. 71).

Santon testified he drove McDonald to the Bucky's gas station (TR. 86-87). During the ride back to the Intrepid, McDonald commented on Santon's sound system in the Camaro and when they arrived at Bucky's, Santon and McDonald were checking in their trunks comparing speakers when the officer arrived (TR. 87-88). Santon believes, but does not specifically recall, whether the police officers drew their firearms when Santon and McDonald were ordered to put their hands on the cruiser (TR. 89-90). Santon admitted using methamphetamine on November 14, 2006 and that he was a regular user of methamphetamine in the past (TR. 96, 98).

## LEGAL ANALYSIS

Officer Alexander looked into the car window of McDonald's closed Intrepid and observed the handle of a firearm protruding from between the console and the driver's seat. Officer Alexander did not violate Santon's Fourth Amendment rights by making the observation since he was in a public place and Santon had no expectation of privacy or standing in McDonald's Intrepid. **See *Minnesota v. Dickerson***, 508 U.S. 366, 375 (1993) (Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."); ***United States v. Beatty***, 170 F.3d 811, 814 (8th Cir. 1999). Officer Alexander immediately determined the operator of the vehicle was in violation of the law since it is a violation of law to possess a concealed weapon, that is, a firearm which is not visible in its entirety.

Observing the concealed weapon provided the officers with reasonable suspicion to stop and briefly detain McDonald and Santon who later approached the Intrepid.

> A law enforcement officer is permitted to stop and briefly detain a defendant for investigative purposes so long as he has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" A Terry stop is permissible even when the officer lacks probable cause to make an arrest.

*United States v. Esquivias*, 416 F.3d 696, 701 (8th Cir. 2005) (**citing** *United States v. Johnson*, 64 F.3d 1120, 1124 (8th Cir.1995) (**quoting** *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Therefore, an investigative detention must be supported by a reasonable articulable suspicion of criminal activity.

> [The Eighth Circuit] has summarized the standards used to consider whether reasonable suspicion exists as follows:
> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. The totality of the circumstances -- the whole picture -- must be taken into account. We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

*United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted); **see also** *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). Even where all of the suspect's conduct is lawful, if the conduct is ambiguous and susceptible to an innocent explanation as well as creating a reasonable suspicion of criminal activity, police officers may detain the individual to resolve the ambiguity. *Wardlow*, 528 U.S. at 125-26. "[An] officer's suspicion is reasonable if the officer knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed." *Esquivias*, 416 F.3d at 701 (citation omitted).

      Officer Alexander and the other OPD officers were present to investigate the report of possible drug activity as it related to the Intrepid. While the mere reports of possible drug activity did not give the officers probable cause to search or arrest anyone, the

5

observation of the concealed firearm did give the officers probable cause to arrest a person connected with the Intrepid for the offense of carrying a concealed weapon. Further, combined with the gas station clerk's report of suspected drug activity, the presence of a concealed firearm, and the Camaro joining the Intrepid with the occupants getting out of the Camaro and rummaging in the trunks, gave the OPD officers reasonable suspicion that criminal activity was afoot. As such, the officers had a right to detain both McDonald and Santon for further investigation. The limited investigation was to identify and frisk the two subjects, particularly for officer safety when a firearm was known to be involved. "During any investigative stop, officers may take steps reasonably necessary to protect their personal safety." **United States v. Bell**, 480 F.3d 860, 864 (8th Cir. 2007) (citation and internal quotations omitted); **see United States v. Navarrete-Barron**, 192 F.3d 786, 791 (8th Cir. 1999) (reasonableness depends on the circumstances including whether the officers think the suspect has a weapon).

> While the "purpose of a pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," and while the search must therefore "be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," officers may lawfully seize contraband they incidentally discover in "plain touch" during a **Terry** frisk.

**United States v. Bustos-Torres**, 396 F.3d 935, 943-44 (8th Cir. 2005) (**quoting Minnesota v. Dickerson**, 508 U.S. 366, 373 (1993)). Finally, "if an officer has arrested the individual, the officer may search the individual's person incident to that arrest and may reach into his pockets. A search incident to arrest is justified by the concern for officer safety and the need to collect evidence of the offense." **United States v. Pratt**, 355 F.3d 1119, 1121-22 (8th Cir. 2004) (**citing United States v. Robinson**, 414 U.S. 218, 234, 226, 236 (1973)).

Based on the circumstances present here, the frisks of each of the two males was justified and allowable under the Fourth Amendment under the facts of this case. Officer Kroeger's discovery of the methamphetamine on Santon and the discovery that Santon was a suspended driver, gave the officers probable cause to arrest Santon and search his

Camaro.  **See** *Florida v. White*, 526 U.S. 559, 565 (1999); *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006).  Even if Officer Kroeger had not discovered the methamphetamine on Santon during the frisk, Santon would have been subject to a search of his person and the Camaro incident to his arrest for driving on a suspended license.  **See** *United States v. Stephens*, 350 F.3d 778, 780 (8th Cir. 2003).  As such the items seized are admissible under the inevitable discovery doctrine.  **See** *United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003).  Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**
Santon's motion to suppress (Filing No. 30) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 25th day of May, 2007.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge